Illinois Appellate Court First District Court is now in session. The 6th Division, the Honorable Justice Sanjay T. Taylor presiding. Case number 22-0137, consolidated with 22-0138 and 22-0311, Marcelino Salinas v. Illinois Department of Employment Security. Good afternoon. My name is Sanjay T. Taylor. I'm the presiding judge of the 6th Division of the First District Appellate Court. I'm joined this afternoon by my colleagues, Justice Michael Hyman and Justice Celia Gamrath. If I can ask counsel to introduce themselves and tell us who they and we'll start with the appellant, the state, Mr. Moe. Certainly. Good afternoon, Your Honor. Assistant Attorney General Alex Moe on behalf of the Department of Employment Security, its director, and the Board of Review in all three matters. Thank you, Mr. Moe. Good afternoon. And then, Mr. Goodman. Adam Goodman, Your Honors. On behalf of the three appellees, Mr. Sonny Salinas and we're all former employees. Okay. So, Mr. Moe, you will have 20 minutes to present your argument. That includes rebuttal. Would you like to reserve any of that 20 minutes for rebuttal? If I may reserve five, Your Honor. And then, Mr. Goodman, you'll have 20 minutes to present your argument. Mr. Moe, we're with you. Thank you, Your Honor, and good afternoon again. Each plaintiff in these three consolidated cases was discharged for having falsified cleaning records at a pharmaceutical company. The Board of Review concluded that each had engaged in misconduct and was therefore ineligible for unemployment benefits. Under Section 602A of the Unemployment Insurance Act, misconduct is a three part test. The first part asks whether the employee violated a reasonable rule. The third part asks whether that violation was repeated or caused harm. Neither of those elements is disputed on appeal. At issue today is the second part of misconduct, whether the plaintiff's violations were deliberate and willful. Here, the Board's conclusions that those violations were deliberate and willful was not against the manifest weight of the evidence. This court should reverse the circuit court and instead affirm the Board in each case. How do you explain that there are, I believe, like 30 cases that go the other way? Certainly, Your Honor. These are identical cases. It's not, I mean, the briefs are pretty much identical. I mean, this is the same issue with all three cases before us, right? Not exactly, Your Honor. Okay. So each of these three cases proceeded separately before the Department at its various different stages, and the evidence presented in each of these three cases was different. It is true that at the end of the day, all, I believe, 33 employees were discharged from the same employer for essentially the same reason, but in a deliberate and willful analysis, the Board examines essentially the state of mind of each employee, what they knew and why they were doing it. That's a plaintiff-specific question, and that is one of the reasons why each of these cases needs to be adjudicated based on its own administrative record. So it's certainly true from a 10,000-foot view that there were 33 employees, and I don't know personally, I have no reason to doubt counsel's representation that the majority of the other cases came out differently before the Board, but we simply don't know what was in those administrative records. We don't know why those decisions came out the way they did. Well, we can certainly assume, Mr. Moe, can't we, that the testimony in these cases was unrebutted, that these employees were simply following the direction whether expressed or implied of their employer to falsify these cleaning logs in order to maximize production? The employees represented testified he never disputed that testimony, so it was undisputed that they were simply acting at the direction of their employer, so we can probably assume that that's why those folks were granted benefits in those 30 other cases. How do you, I mean, isn't this a case of clear error where the testimony is unrebutted? Not exactly, Your Honor, and this question in particular is a good one because I think it gets to the distinctions between what was in the papers, including before this Court, and what the actual evidence adduced at hearing each of these three cases was. As an example, in the first of these three cases, Mr. Likudin never testified that he was directed to falsify records. That testimony was simply not presented in the administrative record. There's an absence of evidence in that case. In direct contrast, the second of these three cases, the Likudin case, and apologies if I mispronounced that, I'm sure counsel will correct me if I did, in the second of these three cases, Mr. Likudin testified to a lot of things. He initially testified that he did the cleaning just at a different time. He then testified that he didn't do the cleaning and was told not to, and in that case, the employer's representative actually testified that when he had spoken to Mr. Likudin prior to the termination, Mr. Likudin had denied any wrongful conduct and instead stated that he cleaned the areas as directed, and he had always cleaned them, and he had never been instructed to lie or otherwise fabricate records. So I certainly understand that at the end of the day, these employees were working in the same facility, but the specific question of what these employees knew and what they were told to do is a fact-sensitive question based on what each employee was actually told. Didn't the referees in this case find that the employees received either expressed or implied direction to falsify the records? I mean, wasn't that the finding of the referee? And then notwithstanding that, they were still disqualified because they violated a known policy not to falsify records? That was not the finding of the referee in the Salinas case. I believe it was not the finding in the Likudin case either, though your honor might have something before you that I don't, but in either event, the referee does conduct the hearing, and the referee is the one who actually speaks at hearing, but the decision under review is that of the board. And certainly, with respect to the board's conclusions, in the Salinas case, the board did not reach such a factual conclusion. The board's factual conclusion was that Mr. Salinas had not been given direction to falsify records, and as I previously noted, there was never any testimony as to that point in that hearing. As to the second and third cases, the Likudin and the Sony cases, the board concluded that to whatever extent the supervisors may have been aware of the conduct of the employees, that that didn't absolve them of having violated the employer's policy in the first place. So to follow up on that point, in the Likudin case, the referee found that he was directed by his manager to not follow the company's procedure. And that the referee found that the practice was condoned by supervisors, and that he was actually rebuffed when he attempted to speak with management about it. Isn't that the referee's finding? Yes, Your Honor, it is. I would direct the courts to the board's conclusions in that case, though. This would be at page 221 off the Likudin record. The board concluded that Mr. Likudin never reported the misalleged direction that he had received to upper management or human resources, and separate and apart from that question, that to whatever extent the company or its supervisors had condoned the violation, that that did not absolve Mr. Likudin of the consequences of his own actions. On that point, I would note that to whatever extent plaintiffs did receive direct instructions to falsify cleaning records, that doesn't excuse misconduct. The Supreme Court has defined the state of mind necessary for a deliberate and willful violation, this is out of the Petrovic case, as a conscious act made in violation of the employer's rules when the employee knows the action is against the rules. And respectfully, the employees here are undertaking fairly important work. They're compounding drugs at a pharmaceutical company. And so cleaning is not something that is secondary to the objective. I don't think it's a stretch of the imagination to see how, for example, cleaning a public restroom might not be a top priority. But this is a pharmaceutical company, and as was testified to by the employer's representative in both the Salinas and the Sony cases, production here was subject to FDA regulations, as it would need to be, because these are pharmaceuticals. So if an employee in that position is directed to bypass safety protocols, or to take action that they know is might may result in an unsafe product, or that is against the rules in such a meaningful and important way, it's not reasonable for the employee to turn around, undertake the action, and essentially pass it off as direction of a supervisor. But in the context of one of the claimants, he testified that he tried to but was rebuffed and another claimant testified that he was afraid he'd lose his job. I mean, these are all long time employees, right? I mean, these aren't folks that are 10 employees have only been there a few months. I mean, these some of these employees, one was like 16 years, I think the other was 12. 23. One was 23. Correct. I believe the shortest tenure was Mr. Sony with eight years. He testified to in the hearing. Certainly, it's true that these employees have been there for a long time. But and this is also induced at hearing at all three of them, they knew what the policy requirements were, they knew that their job obligated them to undertake cleaning during their shift of each of their stations. And cleaning here, I should also note, this is not just a matter of one person conducting a cleaning and calling it a day. The employer representative testified in all three of these cases, that cleaning meant a deep clean, that there was one person to perform cleaning the person to verify it, that there were multiple people involved with the cleaning when it occurred, and that the cleaning itself was expected to take possibly two hours of the employees entire shift. This is a substantial portion of the job requirement. And to the again, to the extent the employees were given direction to ignore this component of their job, that that might be problematic for the employer, certainly. But the employees themselves should certainly know that what they are being asked to do is wrong. And why did any of the employees receive any warnings or in their records? Were they criticized or punished? Or was it recorded that they weren't doing their jobs? Anything like that? I believe that in all three of the cases, the record reflects that no that no warnings were understood. That's what I agree. And so there was nothing. These employees were excellent employees. Their records apparently were clean. These were, they followed the rules. They did what they were supposed to do. It just seems like the pointing, the company's pointing the finger at the employees for doing exactly what the employer wanted done. Respectfully, your honor, the employees were not doing what they were supposed to do. All of them were aware of the policy and all of them were aware that the policy required them to undertake cleaning in a certain way. Otherwise, otherwise, we wouldn't have this tremendous break between the cases, these three and the others. There's something going on here, because 27 can't be right, and three wrong, either 27 are wrong and three are, you know, are all one way or the other. And you can say, as you wish, that it's on the individual basis. But when you look at the testimony in these cases and what is going on, if there was something wrong, there would have been something in their records. And so this was not something that just occurred at the end. It was a longstanding situation, as we know. And it seems like you're trying to blame the employees for doing something. If they didn't do it, they would have been fired or gotten something would have happened. These people needed these jobs. Respectfully, your honor, these were at-will employees that could have been terminated at any time, sort of regardless of their conduct. That's right. That's right. That makes it even more important that they follow what they had to do. Two hours to clean. They didn't have time to do cleaning in two hours. Did any of the 30 ever testify that they took two hours to clean? Is there anything that you know of in any record that you've seen that somebody took two hours to clean? You said it took two hours according to the company. I'm not aware of that, your honor. But I think more importantly for this court's decision today, the other 30 records that your honor referred to, those records are not before this court. They weren't before the board when it was making its factual findings either. And I certainly understand that these employees were terminated from the same employer. But at the end of the day, we get into questions of what each employee knew, what each employee was doing. And so to the extent that the board was drawing factual conclusions based on facts specific to each employee, it necessarily did so based on the record before. It is entirely possible. Mr. Moe, we're talking about these other cases and one of the things that struck me that's just odd is that the claimants council here tried to submit the decisions of the other referees and the other cases to the board. And the board said, no, because you didn't explain why you couldn't have submitted them before. Well, the reason why they couldn't have submitted them before is because they postponed the hearing. So that just made no sense to me. And it suggests that there may be an issue with how these cases are being decided by the board because apparently none of the five members of the board picked up on this. And this then leads us to the second point in Mr. Goodman's brief that where he argues that the process by which the board decides cases is broken. Your honor's question contains multitudes. So you'll forgive me if I have multiple part answer. To take that last part first, your honor, the other decisions that were presented to the board following the hearing, those were not board decisions. Those were ALJ recommendations. And in one case, the decision of a claims adjudicator. So unless those decisions were then appealed to the board by the employer, those would not have been before the board in any event or would not have known about them. But certainly the board would have considered, hey, look, all these other referees are finding that there was no misconduct, presumably because the employees were directed by their managers and supervisors to falsify the records. And so wouldn't that be something that any fact finder or any decision maker would want to know? I mean, I would certainly want to know it if I was deciding the case. Entirely possible, your honor. I mean, not just possible. I mean, probable, right? These are folks, there's what, 30? I don't recall how many. There was over 30 people that were fired on the same day for the same thing. These aren't all random firings. They were all fired for the same thing. And so, you know, any reasonable decision maker would want to understand what is going on here. Your honor, I see that I've overstayed my welcome. If I might answer your question. We will indulge you. We will indulge you. Thank you. There's two answers there. The first is the procedural point that the board cited in each of its decisions. If one is presenting additional evidence to the board, it has to come with an explanation. That's about the procedural rules subject to review under the abuse of discretion standard. And it's just common sense. For example, if following this hearing, I were to file a brief in this case, the court would be entirely justified in striking it. The court would want to know why I was filing something and why I had taken it upon myself to submit additional evidence unsolicited. The lack of an explanation is the basis for why the board rejected that information. And I would direct the courts to the Rogers case. It's cited in our papers with a very similar fact pattern in terms of the board's, the board's not having the discretion. Are you saying that the board rejected the evidence because Mr. Goodman failed to explain its relevance? That is the reasoning set forth in the board's decisions, your honor. Isn't it self-evident where the referees are shining that the claimants did not engage in misconduct? No, your honor. Okay. It is not, your honor. And in the Rogers case, this court actually rejected that very argument. In that decision, the circuit court reversed the board's, reversed the board's rejection of additional evidence, holding that in that case, and I quote, the record was replete with reasons, close quote, as to why the late submitted evidence was relevant. And the court said quite simply, it was not, no explanation was provided to the board. And without an explanation, the board was entirely justified in not considering it. Well, why wouldn't you do what we would do? If you didn't submit that additional brief after afterwards, and did not give us the reason, I would expect that we would ask this simple question is why should we consider this brief? Give us the reasons. And if that's the rule, which you said it is the rule, then here's the rule. Not everybody knows all the rules. So we would say to you, give us a basis, and we'll take it under consideration. And then we'll decide, but to reject it out of hand is what happened here. So I think that we need to consider the way the board is operating here. They did not even ask if that was their decision. They didn't have the reasons. And why don't you tell me why they couldn't ask? They certainly could have, Your Honor. The point is simply that it's not an abuse of discretion for the board to enforce its own procedural rules. Well, maybe it is that they didn't ask because this is a very, all these cases are very important, right? To both sides. And the board is supposed to be neutral. They want to hear, they want the evidence. They want to have the best arguments. They wouldn't want to leave something out that's important. And they don't know if it's important or not because there's no explanation. So in that abuse of discretion, when you don't even consider the discretion because you don't even know the reasons. I mean, it was dismissed out of hand. Isn't that a problem? How would you think if we dismissed you out of hand and didn't give you a chance to explain yourself? I mean, I think we would. We always do. Your Honor, I would certainly want to be heard and I can at the end of the day, it was not an abuse of discretion for the board to stand on its rules. And in that respect, this case is on all fours with Rogers. But and even beyond that, the board did address the additional decisions that were presented to it. And this gets to a distinction that I think is very important because in parts, the parties are talking past each other. I have no issue with the proposition that in a different case, a different hearing officer reviewed different facts and reached a different conclusion. That's fine. The problem occurs when plaintiffs are presenting these factual conclusions as a way to backdoor additional facts into the record of each of these three cases. To whatever extent there was additional testimony, additional documentation or other information presented in any of the other 30 cases that plaintiffs wanted to present in each of these three records below. The time to do so was at the administrative hearing. They could have called these witnesses. They could have presented the evidence. What they can't do and what no party in litigation can do is to essentially have their trial and then following the trial present factual conclusions from a different case and ask the court or in this case, the board to accept those factual conclusions as facts for the purposes. They didn't ask that. They didn't ask, isn't it possible before us that if a decision comes down after you breathe, after the trial or the matter that's under appeal, a case comes down, you bring it to our attention. That happens all the time. And you ask, will you take it? Here's why I should take it, right? Usually the lawyer will say, here's why I think you should consider it. And we make a decision. Why doesn't that apply to this board? The statutory answer, Your Honor, is that under the Unemployment Insurance Act, decisions, even of the board, are of no preclusive effect. There is no res judicata. There is no preclusion. There is no estoppel from any of these decisions. That's understood. They're not precedent, but they may have a bearing. I mean, they could have had a bear. We don't know because they didn't ask for the reasons. But that goes to the issue of the process here and whether they abuse the discretion because they didn't even ask what the reasons were and why they should consider it, knowing just what you just said. I don't doubt what you said at all. But in light of that, that doesn't mean that these should be not considered at all. Maybe they should. Maybe we shouldn't. We don't know. Well, Your Honor, we have the benefit of the what if, because in each of these three decisions, the board below did go on to say, we're going to reject these additional claims decisions. But even if we were to consider them, they wouldn't change the outcome. So we do know what the board would have done if it had considered it. Tramone, I'd like to ask you. So Mr. Goodman, in his brief, cites the article by Phil Kattner from the Daily Southtown. And he says that the board staff attorneys overworked. They reviewed their referee decisions and the draft decisions for the board, which the board then, quote, rubber stamps. In that article, a representative of the board is mentioned saying that individual board members or the entire board doesn't review each case, that only a single board member reviews the case. And then the decision of that single board member then is the decision of the entire board. Is that the process that's currently in place at the Board of Review? I am not currently aware of whether the board's current process aligns with that described in the article, Your Honor. Was that the process at the time of the article? In 2015? In 2015, yes. I don't know, Your Honor. That's beyond me. Perhaps you should ask your client if that's the process, given the fact that Mr. Goodman has raised what appears to be quite an important issue in how these decisions are made. Because I'm not aware of there ever being a dissent on the Board of Review. And I think the board decides thousands, if not more than 10,000 cases a year. And common sense and experience suggests that you can divide people together, particularly from different classes, and present a set of facts to them that on occasion they're going to disagree. So what's the explanation for this? I certainly appreciate Your Honor's concerns. I don't have an explanation to them before the court today. I do note, though, that to whatever extent these concerns have been adequately aired in the papers, these issues are not presented in the administrative record before this court. This is not a due process challenge. This is not a collateral attack on the administrator. Is there anywhere in the regulations or on the IDES website where the board discloses to the public that, you know, only a single member of the board decides each case and that the other members simply just follow along? I don't know, Your Honor, and I also don't know whether that would be a true statement. I would also note that... Oh, let me ask you this. Would it... I mean, you've been around for a while. You get five people in a room together. Would you agree that on occasion they're going to disagree? Absolutely, Your Honor, but I think with respect to this specific issue, there may be some selection bias, or rather survivor bias. If the board disagrees with a referee's decision, the board certainly can and does either reverse that decision. No, I'm not talking about disagreeing with the referee's decision. I'm talking about the board members disagreeing with each other. Because remember, you know, two members of the board are from the labor organization class, two members are from the employer class, and one is from neither. And I just know you get a couple people in a room together, on occasion they're going to disagree, and these folks have apparently never disagreed, and my question to you is simply, how can that be? I'm not sure, Your Honor, and I also, with great respect, I don't know whether the factual predicate of Your Honor's question is accurate. What I do know, Your Honor, is that in this case, he's raised it, right? Mr. Goodman has raised it. This is not something that, you know, he, you know, the general public is aware of. How is this issue ever to be raised? With great respect, I suggest that Springfield might be a better forum, to the extent there are concerns about the institutional structure of the board itself, or of how the department adjudicates claims. But what I can tell you... Do you know how many decisions the board makes every year? I'm not sure, Your Honor, and I also don't know how that breaks down between decisions that uphold benefits versus decisions that reverse benefits, versus ones that end up getting to court. Let me ask a different question. Do you dispute that the full board does not meet together? Have you known of any instance with regard to deciding a case that the full board has met, whether in person or by Zoom, have five people get together? Does that ever happen? I don't know the answer to Your Honor's question either way, but what I can advise the court, and we referenced this in our briefs, I apologize that I don't have a citation off the top of my head, is that in matters of administrative procedure, administrative agencies are presumed to act in conformity with the law. Again, I certainly... That's not my question. That's the problem I'm having with the argument. I understand that the board has decided hundreds of thousands of cases, and it's discrete. I'm not aware, nor is there any institutional memory in the circuit court of there ever being a dissent. And I think the only explanation for that is, as a statistician might tell you, is that it's because only a single member is deciding the cases, and the others are just representing. I mean, do you dispute that? I do, Your Honor, and... What basis do you have to dispute it? You're representing to me that in every case, including the three that are before us, the Salinas, the Lickledyne, and the Sony case, you're representing to this court that all five members, or it may be four, because I think there was a four-member board in each of these cases, perhaps there was a vacancy. You're representing to this court that all four members of the board considered the merits of these appeals, and all five members ruled as they did on the merits. Thank you for the clarification. No, I cannot make that representation, because that information is simply not... Isn't that a problem? Because if the board, if each member of the boards... I think it's frozen. It's frozen now. Are the three of you actually in the building? Maybe someone can go to his... Oh, he's unfrozen. I think he's unfrozen. Justice Taylor, you spoke on it. Yes, I did. If you could repeat those last few sentences. Thank you. Of course, I lost my train of thought. But what I'm trying to get at is that I'm trying to get to the bottom of this. And what I'm trying to get at is I think in each of these cases, there's four members of the board. It may be that there was not a fifth member because there's a vacancy, maybe there's a recusal, I don't know. But four members of the board signed the decision. Wouldn't that tell a reasonable person that that person considered the merits of the appeal and decided the decision of the case on the merits? I agree with that proposition, Your Honor. But you can't represent to us that that's in fact what actually happened here. No, Your Honor, because that information is not... Is that correct? Is that correct? I'm sorry? You can't represent to us that that's what actually happened here, that all four members of the board considered the merits of the appeal. Is that correct? Correct. I can't make a representation either way on that issue because that information is not in the administrative record. What I can represent to the court is... We're asking about procedural. Procedural. This is... It may not be in the record, but we're asking about process. Can you answer the question about process? No, Your Honor. We're asking... We know it's not in the record, okay? But we're... And this is something that counsel raised in their brief, right? And you haven't responded to it here or in your brief, head-on. So, if you don't hit it head-on, then what are we to believe? With respect, Your Honor, I would dispute the proposition that counsel raised this in the brief. I don't think that a single citation to a newspaper article makes an argument. That being said, I... That's your... That's your view. But it does raise an issue about procedure. And it was more than just a single line. I think there was a couple of references. So... But in any event, we're interested in the procedure here. So, I understand it's not in the record, but we need to understand the process. And that's what these questions have to do with. Can you run us through the process? How does a case comes in? What is the process today with regard to the broad overview? I do not know the process with respect to how the board of review receives and adjudicates cases. I could certainly guess, but Your Honor doesn't want speculation. I don't... I'm not in a position to be able to make those representations either way. But there is somebody who knows that, I assume. Yes, Your Honor, my client would. This was not an area of extensive preparation in advance of today. And for that inadequacy, I do apologize. Okay. Thank you. I would close by noting that in terms of procedural mechanisms, to the extent that plaintiffs in these or any of the other cases wanted either the referees or the board to consider facts in other cases, there were mechanisms available for them to be able to do that, either by calling witnesses in other cases. There's also a consolidation procedure, both before referees and before the board, which would, if successful, have turned everything into a single proceeding. That didn't happen. And without that, both the board and this court are left analyzing each case based solely on the record in that individual case. And based on those individual records, the board made factual findings which are not against the manifest weight of the evidence. I have greatly overstepped my time. I do apologize to the court for that. I will leave it at that. You don't need to apologize to me, though. We caused... You can't apologize when we're the ones asking the questions. Okay, Mr. Goodman. It's a bedrock principle of the law that's similarly situated. And note I'm saying similarly situated, not identically situated. I'll get to the distinction in a moment. That similarly situated people should be treated the same. That insight underscores lots of things. Class actions, for example. The sentencing guideline. Perhaps the most glaring or strongest way in which that idea is expressed in the law is through precedent. It's one of the, if not the most important reason, underlying precedent that similarly situated people should be treated similarly or identically. And the distinction here between similar and identical stems from the elephant in the room, which Mr. Moe, in his eloquent, very high quality presentation, doesn't even address. In fairness to him, he's the third assistant attorney general during the pendency of these appeals. Our firm was privileged to represent 30 of the 33 people in 30 cases. And I don't know if the other three people had cases or not. There were then seven supervisors and then one supervisor above the seven supervisors. So a total of 41 people. All 41 of those people were fired on the same day. And the reason why all 41 of those people were fired on the same day is set forth in Judge Curry's opinion below, because it applied to Mr. Sone, one of the three people below. And this reason challenges our preconceived notions about the way the world works. But that happens from time to time. The reason why all 41 of these people were fired on the same day is because the employer, Fresenius Cabe, lost a contract to manufacture a generic chemotherapy drug called Abraxane. A-B-R-A-X-A-N-E. And why did Fresenius Cabe lose the contract to manufacture generic Abraxane? Because the Chinese, in other words, the mainland Chinese, the People's Republic of China, equivalent to the Food and Drug Administration, sent inspectors to Melrose Park, Illinois, to inspect the Fresenius Cabe facility. And in a sort of diametrically opposite thing of what popular culture and American perceptions about themselves would say, the Chinese government inspectors were appalled at the quality of the work being done by Fresenius Cabe in Melrose Park, Illinois, and they implemented an immediate ban on the importation into the People's Republic of China of this generic Abraxane because they said that Fresenius Cabe's pharmaceutical manufacturing practices were so unsound that these pharmaceuticals posed an immediate health threat to the people of the People's Republic of China It's a good thing. I think that we're getting a little off topic. Let's get back to what's the issue at hand. That is part of the issue. So we had 41 people fired on the same day. We've read Judge Currie's decision. Let's move forward with your argument. So it's pretextual. So Judge Currie correctly concluded what the 29, you know, what was concluded in 29 of the 30 cases, that firing all of these people, that they were fired, that there were concerns about the cleanliness, but that the violating cleanliness rules have been part of the culture of the organization. The reason why Fresenius Cabe laid these people off is because it lost the Abraxane business. And these people had very little to do. Mr. Soni spent almost all of his time making Abraxane. Now, Mr. Salinas and Mr. Likudin were part of the other half of the organization, and they made other drugs. But you have 33 people, say half of them used to make the Abraxane. The Abraxane was pulled out from underneath them. That's what Judge Currie recognized. That's what many of the referees recognized. What about the argument that these three are not alike and we have to look at what they knew and the testimony and the cases was not the same and that the treatment here is justified because of the record in each of these cases? There's enough in the record of the Soni case, just cabined to the Soni case. There's enough in the record of the Salinas case, just cabined to the Likudin case, and there's enough in the record of the Likudin case, just cabined in the Likudin case to conclude, as Judge Duffy did in the Salinas and Likudin cases, as Judge Currie did in the Soni cases, that the hearing officers in those three cases and the board review in those three cases aired. And there are several reasons why that's the case. The first is, as it was alluded to at length in Judge Taylor's question, Mr. Moe, that these decisions from these other referees and these other hearing officers and these other claims examiners are not controlling. It's not like a decision of the Illinois Supreme Court is binding on this court or a decision of the U.S. Supreme Court is binding on the Illinois Supreme Court. But it is precedent in the sense that it involves similar factional legal issues. And as the panel has already noted to Mr. Moe, it was temporally impossible for us to have submitted these decisions to the hearing officers in these three cases because these decisions either came out after the hearings in these three cases or were received after the hearings. Did you provide an explanation as to why you were filing them in these cases after the fact? We weren't filing them after the fact, Your Honor. They were attached to our brief in the board review as exhibits, in much the same way as if we were to cite an unpublished California decision or something to this court, we might- Are you saying, Mr. Goodman, that in your brief, you attached them and explained that these decisions found in favor of the claimants? Correct. There was argument and that is in the record on appeal in each of these three cases. And it was in the records, the record on appeal before Judge Duffy and Judge Curry in the three cases below it because we presented the other claims examiner and hearing officer decisions to the board of review to show the score. Let me just stop you. You practice in this area. You have experience beyond these cases, correct? Occasionally, I am much more a plaintiff contention lawyer, but go ahead. All right. So on these cases that you handled, Mr. Moe said that you should explain why you attached these cases and that the reason the board didn't take them is because, consider them is because you didn't explain that. Can you address his response? Sure. It's not precise or fair. And the briefs, this is the fourth level of appeal in an unemployment compensation appeal. And your honors have in the records in all three cases, copies of everything that was submitted to the circuit court and everything that was submitted to the board of review and everything that was submitted to the ALJs. And we offered the board of review the decisions of the extant decisions of the other ALJs at the time we filed the board of review briefs in those cases. And we offered the argument, the same argument that we offered in our briefs in this case and the same argument that we offered in our briefs in the trial court that the board of review ought to follow the weights, the quantitative weight and the reasoning of each of these various claims, examiners and hearing officers. We quoted from some of the decisions in text in the briefs. We attached photocopies or PDFs of the briefs, the decisions to our briefs. And it was crystal clear why we were doing this. We were doing this because we were invoking this as similarly situated people who ought to be treated the same. And we were also trying to show that it was 29 to one or at the time 26 to three or 25 to four or whatever. And it's better to be on the 25 than the four. It's better to be on the 29 than the one. But one of your honors asked about the tweening. I'm burdened, of course, by how our office handled 30 of these cases. And I did not handle all 30 of them, but I handled a number of them. But I'm pretty sure there are references in the records on appeal in these three cases. If there are not, there are references in the record on appeal many, many, many of the 30 that our office is involved in, where people said that the culture of the organization over and over again, people said the culture of the organization was that you did the cleaning when you had the time. So if there weren't drugs to make, you did the cleaning. And if there were drugs to make, you didn't do the cleaning. Moreover, of the seven supervisors, the testimony was in many of the 30 cases below, perhaps in these three cases, that of the seven supervisors, that four or five of them had themselves been lying. Pharmaceutical makers had the job that the 33 people had. But don't we have to look at that case by case? These are three separate cases, okay? So if the lawyer, I'm not pointing, I'm just saying in any case, there can be two identical cases. In one, the lawyer bats the eyes and crosses the teeth. And in the other, he only bats the eyes or she. He doesn't cross the teeth. Missed some key questions, a key witness, key document, whatever. Those cases aren't necessarily treated the same, are they? In your experience? You are correct. Craft is part of the profession and craft is sometimes affects the outcome, you know, legitimate evidence. The accurate evidence can be suppressed for public policy reasons. There's a variety of circumstances under which craft can affect the outcome. But here, I am answering questions that were raised of Mr. Mo. I'm answering them on a gestalt basis across the, you know, you asked Mr. Mo, do you know whether X, I happen to know. And I'm not positive as I sit here today, whether I know from the Sony case or the Salinas case or the liquid case or some pastiche of multiple cases that might include some, but not all. It's possible that the record in the Sony case or the Salinas case of the liquid case does not supply these answers. But I'm offering this information for the panel's application, not because I believe. Mr. Goodman, I want to move on to another question. You, we were asking Mr. Mo a number of questions regarding the process by which the board decides cases. And I'm wondering if you know the answer to any of those questions, Mr. Mo did not. Do you know the process by which the board decides cases? Not really.  Fair enough. Do you, are you aware of any dissent from the board? None, none. I, I'm aware of your honor's thoughts from 10 years ago. When you sat in tax and miscellaneous remedies and heard first level circuit court appeal. And that I found that through, through Mr. Cadner's article in the Daily South Town. I am not aware of whether the procedures described in the Daily South Town were accurate in 2015 or in 2022 or today. I have handled, I've handled a handful of cases with IDS ALJ cases from time to time, but I do not have any in-depth knowledge about the procedures. I think that whether Judge Taylor's advocacy or comments as reflected in the Daily South Town article nine years ago were accurate or are accurate today. Whether the court is correct in, in, in whether I, in adopting or sharing my inference at the Board of Review may in some ways be a, be a farce or may not support with procedural due process. Those, those are interesting questions. And I think Mr. Moe is incorrect to say that they're properly addressed solely to Springfield. I think the court has the prerogative to, to opine on them in the foreground in, in, in an opinion, if, if, if, if you're honest to leave it as appropriate. But it's not necessary to reach the question of whether the Board of Review's procedures are wholly unsound or were wholly unsound. Your point is that we can rule simply on the merits of the appeal. We don't need to reach the- Correct, correct. You mentioned procedural due process, which is not a term or phrase you use in your brief, but would you explain that?  I'm just using that as shorthand for the idea that's, that's sometimes associated with the, you know, the late Warren court and the early Berger court in the 1960s and 1970s of, that before someone, you know, expressed in cases involving the family law, cases involving auto repossessions, that, that before someone's property is to be taken from them, that they're entitled to a meaningful opportunity to be heard. That idea is also expressed in other U.S. Supreme Court cases from several decades earlier, Mullane, for example, the case that says that, that notice by publication is heavily disfavored if you can be so unprocedural due process, that a meaningful opportunity to be heard would include, if it's a multi-person panel, that each member of the panel perhaps participate in that. I don't know that there is a constitutional right to an appeal, but if the legislature or if administrative rules provide an appeal, that that appeal has to be meaningful. And meaningful means that, that the arguments presented are confronted. And while the, while the board of review is presently constituted, may or may not be an outrage to one's sensibility here with regard to the three gentlemen whose unemployment compensation is at issue, I would respectfully suggest that Judge Duffy and Judge Murray got it right, that the board of review's decision on its face, the four corners of the board of review's decision, suggests that the board of review ignored the big picture. They ignored the precedent from the 10 or so other cases they were offered. They ignored in the, in the Sony case, the factual information, which a number of the other referees and hearing officers picked up on and discussed in their decisions, that the loss of work was the true reason to be dismantled. And they ignored the information which suffused the entire record in all three of these cases, as well as all these other decisions, which is that the true culture of this employer, unfortunately, was that cleaning was the lowest priority. And while there was a procedures manual on the shelf or on the internet somewhere that said you were supposed to clean, as a practical matter, if you were only working eight hours or 10 hours or whatever your shift was, and there were drugs to be made, you were supposed to make the drugs and the cleaning was supposed to wait. And if the cleaning waited- Thank you, Mr. Goodman. Your time is up. Do we have any more questions from the panel? I do have one question. Mr. Moe made the point to say the decisions that were attached to your brief, some of those were referee decisions. He wasn't aware whether the employer appealed those or not. You have represented to a court that you have represented approximately 30 of these individuals. Tell me the ones who received favorable outcomes, meaning the employees that you represented, did they receive favorable outcomes at the ALJ referee stage and it stopped there? Or did they go on to the board where the board affirmed or adopted the referee's decision and then it stopped there? We were responsible for all of the decisions that we attached from the other ALJs. We handled- Those were all successful appeals that we brought from claims examiner decision where the claims examiner was reversed by the ALJ. The employer, Fresenius Covey, did file a few appeals. They filed a few appeals from cases we wanted to claim. Typically, one does not have an attorney at the claims examiner level. But they filed a few appeals from cases that we or our clients wanted the claims examiner level to the ALJs. We'd want all of those. And they filed a few appeals from the ALJ to the board. They sort of saw the score. I mean, I'm just speculating. Fresenius Covey did not file an appearance. The lawyer's not here. They didn't file a brief. But as time went by and we were doing better and better in our batting average, Fresenius Covey started doing less and less. So are you saying that many of those decisions of those 30 did not go to the board of review or did they go to the board of review and stop at that juncture and not get appealed to the circuit court? Help me understand. I do not believe- I do not believe that there were any merits decisions in favor of employees at the board of review. To the extent that Fresenius Covey brought second level appeals, I do not believe they were prosecuted to the point where the board of review issued a decision. They withdrew them or they allowed a deadline to expire without filing a brief or perfecting the record or whatever they had to do. Okay, thank you, Mr. Goodman. Any more questions? Okay, we'll turn back to you, Mr. Milne. Thank you, Your Honor. With the court's permission, I would focus on the new arguments raised in plaintiff's argument. I'd certainly have plenty to say about the other portions, but I think the court has heard enough from me on that. To the question of pretext, that's affirmatively rebutted by the record. In each of these three cases, there was testimony that these employees' positions were filled. In the Salinas case, the employer rep testified the positions were all filled and the new employees were paid the same. That's at page 409. In the Likudin case, the employer rep testified that 20 of the 33 positions had been filled because that hearing happened a little bit earlier and they were looking to fill them all. And in Sony case, the employer's representative testified that they didn't actually close any positions. It's at page 118 in Sony and pages 103 and 104 in the Likudin case. To whatever extent a pretextual argument is properly before this court because one was not presented below, the record affirmatively reflects that the terminated employees were replaced with other employees who were paid the same. So I'm not sure what benefit accrued to the employer because they had the same number of employees being paid the same before and after. To the procedural due process point the council made, I agree with Justice Taylor that those words don't appear in the briefing and they actually don't appear anywhere below. It's well established that a procedural due process claim may be waived if not presented at the administrative level. And here, as far as I can tell from this record, no such claim was presented at the circuit court item. I certainly understand the concerns that council raised. In many ways, they mirror that of the court from the comments about half an hour ago. That being said, what the court has before it is cases that come before it solely on direct administrative review under the administrative review law. And on that point, the last thing that I would like to say is that I understand what council is saying and I have no basis on which to say that his representations are inaccurate. But what I can say is respectfully, many of the things that council said are simply not reflected in the record. The proposition that employees were directed to clean when they can is absent from any of the administrative records here. The information as to representatives from the People's Republic of China is wholly absent from the record. A psych visit to Melrose Park, that's nowhere to be seen. And ultimately, that's- We're aware of that, Mr. Mull. You don't need to dwell on that. We're aware of what's in the record. Thank you, Your Honor. I would just close with that. Each of these cases needs to be adjudicated based on the record in each individual case, as opposed to records in other cases. And based on those individual records, the court's- the board's decisions below should be reviewed against what was actually presented to the board, because that's the information the board used to make its decisions. And that's the information this court should review when affirming those decisions. Unless any of your honors have further questions, I would leave it at that. Mr. Mull, you had- You weren't able to answer many of our questions regarding the process by which the board decides cases, including whether each member of the board in these three cases actually reviewed the record and considered the merits of the appeal before signing their names to the decisions. Would you like an opportunity to file a supplemental brief answering those questions? I certainly can, Your Honor. Does the court want- Would the court prefer that a supplemental submission address the procedural questions more broadly, or what happened in this case in particular? Those might be different sets of answers. I think both. You know, my preference would be not only in this case, but generally, how does the board decide these appeals? What explains the lack of historical dissent, if in fact we're correct in that? You know, are there any instances of dissent in a board decision? And if not, or regardless, does the board operate in a way as reflected in that article that it's a decision of one, it's a decision of all? So the answers to those kinds of questions and the other questions we asked would be helpful. Understood. In that case, yes, Your Honor, I would appreciate such an opportunity. Okay. 21 days enough? Yes, Your Honor. 21 days. Thank you. And then, Mr. Goodman, if you care to file anything in response to that, 14 days, okay? Yes, I understood. Obviously not knowing what it's going to say, or I may not take advantage of that opportunity, but thank you. Okay. Any other questions? Okay. Um, thank you, Mr. Moe and Mr. Goodman for your informed and thoughtful arguments. The case is submitted and we will decide it in due course. Thanks. Thank you, Your Honors.